**ORAL ARGUMENT NOT YET SCHEDULED**

No. 22-7117

IN THE

# United States Court of Appeals for the District of Columbia Circuit

———————————

Michelle Florio, As Personal Representative of the Estate of Steven Florio, Deceased; Patrick Costello; William Millios; Timothy Mallach,

*Plaintiffs-Appellants,*

*v.*

Gallaudet University; Board of Trustees of Gallaudet University; Roberta Cordano; WP Company LLC, d/b/a The Washington Post,

*Defendants-Appellees.*

———————————

On Appeal from the United States District Court for the District of Columbia, Case No. 1: 21-cv-01565-CRC (Hon. Christopher R. Cooper)

———————————

**BRIEF OF DEFENDANTS-APPELLEES GALLAUDET UNIVERSITY, BOARD OF TRUSTEES OF GALLAUDET UNIVERSITY, AND ROBERTA CORDANO**

———————————

Clifford J. Zatz
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004
Phone: (202) 624-2500
Fax: (202) 628-5116
czatz@crowell.com

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**(A)    Parties and Amici**

All Parties, Intervenors, and Amici appearing before the District Court and in this Court are listed in the brief for Appellants.

**(B)    Rulings Under Review**

Reference to rulings at issue appears in the brief for Appellants.

**(C)    Related Cases**

This case has not previously been before this Court or any other court. There are no related cases.

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, Appellee Gallaudet University states that it is a federally chartered non-profit organization.  It has no parent companies, subsidiaries, affiliates, or companies that have a 10% or greater ownership interest.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
    CASES .................................................................................. i

RULE 26.1 DISCLOSURE STATEMENT ........................................... ii

TABLE OF AUTHORITIES ............................................................ v

GLOSSARY OF ABBREVIATIONS ................................................ xi

STATEMENT OF THE ISSUES ....................................................... 1

STATEMENT OF THE CASE .......................................................... 1

SUMMARY OF THE ARGUMENT .................................................. 6

STANDARD OF REVIEW .............................................................. 7

ARGUMENT ................................................................................ 9

I.    THE DISTRICT COURT CORRECTLY DISMISSED
    PLAINTIFFS' CLAIM FOR DEFAMATION. ......................... 9

    A.    President Cordano's Statements Were Not "Of and
        Concerning" Plaintiffs. ...................................................... 10

        1.    The small group exception does not apply to
            Costello or Millios. ................................................. 13

        2.    The small group exception does not apply to
            Florio's case of mistaken identity. ......................... 20

        3.    The District Court did not err in holding that Florio
            and Mallach failed the "of and concerning" test on
            group defamation grounds. .................................... 23

        4.    The District Court correctly ruled that President
            Cordano's remarks could not reasonably be read to
            accuse Florio, Costello, Millios, or Mallach of
            being "the face of systemic racism" at Gallaudet in
            2020 ........................................................................ 24

    B.    "The Face of Systemic Racism" Is First Amendment-
        Protected Opinion, Not A Verifiably False Statement Of
        Fact. .................................................................................. 29

        1.    "The face of systemic racism" is inherently
            figurative and rhetorical, not objectively verifiable. ............ 29

2.    Milkovich does not make "the face of systemic racism" actionable. ............................................... 33

3.    Courts consistently hold accusations of racism or bigotry non-actionable in defamation. .................................. 40

C.    Even If The Challenged Statements Are Held Actionable, Plaintiffs' Claims Were Still Properly Dismissed Because President Cordano's Statement Were Substantially True. ............... 45

II.   PLAINTIFFS' CLAIM FOR DEFAMATION BY IMPLICATION FAILS. ............................................... 48

III.  PLAINTIFFS' CLAIM FOR FALSE LIGHT LIKEWISE FAILS. .............. 50

CONCLUSION ................................................. 52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbas v. Foreign Pol'y Grp., LLC*,
  783 F.3d 1328 (D.C. Cir. 2015)..........................................................................8

*Alexis v. District of Columbia*,
  77 F. Supp. 2d 35 (D.D.C. 1999)........................................ 10, 11, 13, 14, 18, 22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................................................8

*Bauman v. Butowsky*,
  377 F. Supp. 3d 1 (D.D.C. 2019).......................................................31, 49, 50, 51

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................................8

*Brimelow v. N.Y. Times Co.*,
  No. 20 Civ. 222, 2020 WL 7405261 (S.D.N.Y. Dec. 16, 2020) ......................40

*Browning v. Clinton*,
  292 F.3d 235 (D.C. Cir. 2002).................................................................9, 20, 26

*BYD Co. Ltd. v. All. for Am. Mfg.*,
  554 F.Supp.3d 1 (D.D.C. 2021)...............................................................7, 38, 45

*Close It! Title Servs., Inc. v. Nadel*,
  248 A.3d 132 (D.C. 2021) .........................................................................9, 51

*Coates v. Law School Admission Council*,
  Civil Action No. 05–0641, 2005 WL 3213960 (D.D.C. October 25,
  2005) ................................................................................................................8

*Coles v. Wash. Free Weekly, Inc.*,
  881 F. Supp. 26 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir.
  1996) ................................................................................................................9

*Cooper v. Templeton*,
  No. 21-CV-04692, 2022 WL 4367445 (S.D.N.Y. Sept. 21, 2022) ..................40

v

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
   407 F. Supp. 3d 1258 (M.D. Ala. 2019) ..............................................................41

*Cousins v. Goodier*,
   283 A.3d 1140 (Dela. 2022) ......................................................................29, 41

*Croixland Props. Ltd. P'ship v. Corcoran*,
   174 F.3d 213 (D.C. Cir. 1999)................................................................8, 22, 25

*Davis v. Wernick*,
   No. 19-cv-3327, 2021 WL 310999 (D.D.C. Jan. 29, 2021) ................................8

*E.E.O.C. v. St. Francis Xavier Parochial Sch.*,
   117 F.3d 621 (D.C. Cir. 1997)................................................................................2

*Edelman v. Croonquist*,
   No. 09-1938, 2010 WL 1816180 (D.N.J. May 4, 2010) ...................................41

*Farah v. Esquire Mag.*,
   736 F.3d 528 (D.C. Cir. 2013)..........................................................................51

*Feng Wang v. Pompeo*,
   No. 18-cv-1732, 2020 WL 1451598 (D.D.C. Mar. 25, 2020)............................5

*Fowler v. Curtis Pub. Co.*,
   182 F.2d 377 (D.C. Cir. 1950)..........................................................................11

*Garrard v. Charleston Cnty. Sch. Dist.*,
   838 S.E.2d 698 (S.C. Ct. App. 2019) ................................................................42

*Gertz* v. *Robert Welch, Inc.*,
   418 U.S. 323 (1974)....................................................................................30, 43

*Hopkins v. Women's Div., Gen. Bd. of Global Ministries*,
   238 F. Supp. 2d 174 (D.D.C. 2002)..................................................................30

*Howard v. Fed. Express Corp.*,
   316 F. Supp. 3d 234 (D.D.C. 2018)..................................................................49

*Jankovic v. Int'l Crisis Grp.*,
   494 F.3d 1080 (D.C. Cir. 2007).........................................................................11

*Kahl v. Bureau of Nat'l Affairs, Inc.*,
856 F.3d 106 (D.C. Cir. 2017)................................................................7

*Kim v. United States*,
632 F.3d 713 (D.C. Cir. 2011).................................................................7

*Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*,
838 F.2d 1287 (D.C. Cir.), *cert. denied,* 488 U.S. 825 (1988)....................43, 44

*Liberty Lobby, Inc. v. Rees*,
852 F.2d 595 (D.C. Cir. 1988)..............................................................44

*Luhn v. Scott*,
2019 WL 5810309 (D.D.C. Nov. 7, 2019), *aff'd*, 843 F. App'x 326
(D.C. Cir. 2021) .................................................................................9

*Marsh v. Hollander*,
339 F. Supp. 2d 1 (D.D.C. 2004)............................................................2

*Masson v. New Yorker Mag.*,
501 U.S. 496 (1991)...........................................................................48

*McCafferty v. Newsweek Media Grp., Ltd.*,
955 F.3d 352 (3d Cir. 2020) ................................................................40

*McCaskill v. Gallaudet Univ.*,
36 F. Supp. 3d 145 (D.D.C. 2014)....................................................41, 52

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1 (1990), *aff'd,* 875 F.3d 709 (D.C. Cir. 2017) ...............29, 31, 33,
....................................................................................34, 35, 36, 37, 38

*Montgomery v. Risen*,
197 F. Supp. 3d 219 (D.D.C. 2016)......................................................29

*Murphy v. Rosen*,
No. UWY-CV-20-6056754-S, 2022 WL 1538711 (Conn. Super.
Ct. May 16, 2022) .............................................................................42

*Myers v. Plan Takoma, Inc.*,
472 A.2d 44 (D.C. 1983) .....................................................................35

vii

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964)............................................................15, 16, 17, 27

*Nunes v. WP Co. LLC*,
   513 F. Supp. 3d 1 (D.D.C. 2020)........................................................50

*Ollman v. Evans*,
   750 F.2d 970 (D.C. Cir. 1984)...........................................................31

*Overhill Farms Inc. v. Lopez*,
   190 Cal. App. 4th 1248 (4th Dist. 2011) ...........................................42

*Pacira Biosciences, Inc. v. American Society of Anesthesiologists, Inc.*,
   No. 22-1411 (3rd Cir. March 24, 2023)..........................................39, 40

*Precision Contracting Sols., LP v. ANGI Homeservices, Inc.*,
   415 F. Supp. 3d 113 (D.D.C. 2019)....................................................51

*Ratajack v. Brewster Fire Dep't, Inc.*,
   178 F. Supp. 3d 118 (S.D.N.Y. 2016) ................................................41

*Reilly v. WNEP*,
   No. 557 MDA 2020, 2021 WL 1017154 (Pa. Super. Ct. Mar. 17, 2021) ...............................................................................................42

*Rice v. Washington Clinic, Chartered*,
   961 F.2d 964 (D.C. Cir. 1992)...........................................................23

*Riss & Co., Inc. v. Ass'n of Am. R.R.*,
   187 F. Supp. 323 (D.D.C. 1960)........................................................12

*Rosen v. Am. Israel Pub. Affs. Comm.*,
   41 A.3d 1250 (D.C. 2012) ................................................................36

*Ruifang Hu v. K4 Sols., Inc.*,
   No. 18-cv-1240, 2020 WL 1189297 (D.D.C. Mar. 12, 2020)...........29

*Rybas v. Wapner*,
   457 A.2d 108 (Pa. Super. Ct. 1983)..................................................42

*Sall v. Barber*,
   782 P.2d 1216 (Colo. App. 1989).....................................................42

*Service Parking Corp. v. Wash. Times Co.*,
   92 F.2d 502 (D.C. Cir. 1937) .......................................................... 11, 27

*Shearer v. Bakery & Confectionery Workers' Int'l Union of Am.*,
   294 F.2d 235 (D.C. Cir. 1961) .............................................................. 23

*Sigal Constr. Corp. v. Stanbury*,
   586 A.2d 1204 (D.C. 1991) ................................................................... 30

*Skidmore v. Gilbert*,
   No. 20-cv-06415, 2022 WL 464177 (N.D. Cal. Feb. 15, 2022) ........................ 40

*Smith v. Clinton*,
   253 F. Supp. 3d 222 (D.D.C. 2017) .................................................... 49, 51

*Smith v. School District of Philadelphia*,
   112 F. Supp. 2d 417 (E.D. Pa. 2000) ..................................................... 41

*Squitieri v. Piedmont Airlines, Inc.*,
   No. 3:17CV441 (W.D.N.C. 2018) .......................................................... 41

*Steadman v. Sinclair*,
   223 A.D.2d 392 (N.Y. App. Div. 1996) ................................................... 42

*Tagliaferri v. Szulik*,
   No. 15 Civ. 2685, 2016 WL 3023327 (S.D.N.Y. May 25, 2016) ...................... 32

*Vasquez v. Whole Foods Mkt., Inc.*,
   302 F. Supp. 3d 36 (D.D.C. 2018) ......................................................... 26

*Waldon v. Covington*,
   415 A.2d 1070 (D.C. 1980) ................................................................... 23

*Ward v. Zelikovsky*,
   643 A.2d 972 (N.J. 1994) ...................................................................... 42

*Wash. Exec. Servs., Inc. v. Hartford Cas. Ins. Co.*,
   No. 20-2119, 2021 WL 4439060 (D.D.C. Sept. 28, 2021) ............................... 4

*Washington v. Smith*,
   893 F. Supp. 60 (D.D.C. 1995), *aff'd*, 80 F.3d 555 (D.C. Cir. 1996) ............... 37

*Weidlich v. Rung*,
  No. M2017-00045-COA-R3-CV, 2017 WL 4862068 (Tenn. App.
  Oct. 26, 2017) ................................................................................42

*Wender v. Hamburger*,
  393 F.2d 365 (D.C. Cir. 1968) ......................................................23

*White v. Fraternal Order of Police*,
  909 F.2d 512 (D.C. Cir. 1990) ...............................................48, 50

*Wiggins v. Dist. Cablevision, Inc.*,
  853 F.Supp. 484 (D.D.C. 1994) ......................................................8

*Williams v. Lazer*,
  495 P.3d 93 (Nev. 2021) .................................................................42

*Xiaobing Liu v. Blinken*,
  No. 21-cv-629, 544 F.Supp.3d 1 (D.D.C. June 18, 2021) ...................5

**U.S. Constitution**

U.S. Const., amend. I ........................................................7, 10, 36

**Rules**

Fed. R. Civ. P. 12(b)(6) ..............................................................7, 8

**Other Authorities**

Odgers, *Libel and Slander* (6th Ed. 1929) ............................................12

Robert D. Sack, *Defamation: Libel, Slander, and Related Problems*, §
  2:10.1. (5th ed. 2017) ........................................................................23

# GLOSSARY OF ABBREVIATIONS

American Sign Language is abbreviated as "ASL." Otherwise, this brief uses no abbreviations, except in citing to the Amended Complaint ("AC"), the Joint Appendix ("JA"), and the Opening Brief for Appellants ("App. Br.").

## STATEMENT OF THE ISSUES

1.    Was President Cordano's characterization of Kappa Gamma as "the face of systemic racism in our community" a group defamation under controlling law, such that these four individual Plaintiffs, Kappa Gamma alumni thirty years removed from campus, failed to meet the "of and concerning" requirement to sue for defamation?

2.    Is "the face of systemic racism" figurative and rhetorical speech that cannot be objectively verified, and therefore non-actionable opinion?

3.    "Because none of [the] challenged statements concern the individual plaintiffs, and others are also either non-actionable opinion or concededly true," was the District Court's dismissal of the Amended Complaint proper?

## STATEMENT OF THE CASE

Against the backdrop of "the tragic death of George Floyd . . . and in the midst of the resulting Black Lives Matter protests . . . ."  [Amended Complaint ("AC") ¶ 112; Joint Appendix ("JA") 29], Gallaudet University President Roberta Cordano addressed the University community in a YouTube video on June 9, 2020 about "Acting on our history of systemic racism." https://www.youtube.com/watch?v=hqdA3Zmtay0.  She described the community as being "at a threshold moment.  We are being called to deepen our demonstration of our commitment to the work of dismantling racism."  [AC ¶¶ 125-26; JA76-

1

77].[1]  "[T]his work must be taken up by all parts of Gallaudet," she emphasized, "because, as an institution, we have a history of racism and bias that must be addressed."  [JA76].

In the course of her address—delivered in American Sign Language ("ASL")—President Cordano also announced the suspension of the Kappa Gamma fraternity by the University.  Reporting on the public reaction to recent revelations involving the fraternity, she opined that Kappa Gamma had "become the face of systemic racism in our community, with photographs of the salute and use of robes being shared on social media."  [JA76]. She made no reference to these Plaintiffs, all of them alumni decades removed from their student days at Gallaudet.[2]  She did not display any photograph, describe the salute, or characterize the robes.

According to the Amended Complaint, President Cordano said, in ASL, as follows in the relevant portion of the June 9, 2020 video:

> During the past few days, starting with the [Student Body Government/Black Student Union] Town Hall meeting last

---

[1] The videos (or "vlogs") and transcripts of President Cordano's June 9 and July 16, 2020 remarks contain the allegedly defamatory statements, are incorporated by reference in the Amended Complaint, and, as such, were properly considered by the District Court on a motion to dismiss.  *See E.E.O.C. v. St. Francis Xavier Parochial Sch.,* 117 F.3d 621, 625 (D.C. Cir. 1997); *Marsh v. Hollander,* 339 F. Supp. 2d 1, 5 (D.D.C. 2004).

[2]  Florio alleges that he became a member in 1991. [AC ¶ 223; JA59]. Costello alleges that he joined the fraternity in 1987.  [AC ¶ 241; JA62].  Millios graduated from the University in 1991.  [AC ¶ 255; JA64].  Mallach was a member of Kappa Gamma for only a few months in 1990.  [AC ¶ 269; JA66].

> Friday, we received new information that led to many people
> calling for attention to Kappa Gamma, one of Gallaudet's long
> established fraternities. Kappa Gamma, pictures distributed on
> social media of their use of hooded robes and of the salute, they
> have become the face of systemic racism. This behavior is
> unacceptable.

[AC ¶ 125; JA32]. What Plaintiffs call a "purported" transcript of the vlog [AC ¶

126; JA32] reads slightly differently:

> Over the past few days, with the [Student Body
> Government/Black Student Union] Town Hall last Friday, we
> became aware of new information that led to renewed demands
> for change with Kappa Gamma, a fraternity with a long history
> at Gallaudet.  They have become the face of systemic racism in
> our community, with photographs of the salute and use of robes
> being shared on social media.  This behavior is unacceptable.
> Gallaudet has now taken action to suspend Kappa Gamma on
> campus . . . .

[JA32-33] [*see also* AC ¶ 126; JA76-77].[3]

The Amended Complaint alleges that the so-called Bellamy salute was given

along with the Pledge of Allegiance beginning in 1892. Kappa Gamma began

using it in 1901. [AC ¶ 72-73; JA22].  In the 1920s and 1930s, however, Italian

Fascists and German Nazis adopted a salute "having some similarities in

appearance to the Bellamy salute."  [AC ¶ 74; JA22].  Congress amended the Flag

Code in 1942 to replace the Bellamy salute with the current hand-over-heart salute.

---

[3] The Amended Complaint does not identify the source of the first quotation from
President Cordano's remarks; it is presumably Plaintiffs' own interpretation of the
sign language they saw on the video.  The Amended Complaint does not explain
why Plaintiffs call the transcript "purported."

[AC ¶ 76; JA22].  Kappa Gamma ceased using the Bellamy salute in 1992 or 1993. [AC ¶ 83; JA23-24].

Plaintiffs argue that, given its origins, the salute used by Kappa Gamma cannot be associated with racism, even almost eighty years after it last accompanied the Pledge of Allegiance.  Yet they concede that the salutes "have some similarities in appearance" and that Kappa Gamma "denounced" the salute in 2016 as contrary to its present-day standards of conduct.  [AC ¶ 175; JA47-48].

Kappa Gamma began using its ceremonial robes in 1904.  [AC ¶ 85; JA24]. In 2014, the Student Body Government issued a report to University administrators with a list of concerns, including "the use of robes and symbols that were similar to those used by hate groups; the use of artifacts that could serve as negative triggers or that have similarities and/or associations with hate groups…" [AC ¶93; JA25; quotation at JA80].

On July 10, 2015, the Dean of Student Affairs announced that "[t]he use of robes and other similar regalia during marches and other public events on and off campus is permanently banned."  [AC ¶¶ 95-96; JA25; correct date at JA79].[4]

---

[4] The July 10, 2015 announcement [JA79-82] is incorporated into the Amended Complaint because Plaintiffs necessarily rely on it when they discuss it and quote it.  [AC ¶¶ 95-99; JA25-26] (incorrectly referred to as the July 15 announcement). *Wash. Exec. Servs., Inc. v. Hartford Cas. Ins. Co.*, No. 20-2119, 2021 WL 4439060, at *2 (D.D.C. Sept. 28, 2021) ("Although a court seldom considers 'matters beyond the pleadings for a motion to dismiss, it may consider ... documents attached as exhibits or incorporated by reference in the complaint,' as

4

"Conduct that was tolerated decades ago," Dean Benedict explained, "is no longer acceptable." [JA81]. Kappa Gamma "supported, accepted and respected that ban . . . ." [AC ¶ 100; JA26].

In early June 2020, however, "new evidence emerged about the Kappa Gamma student chapter's intention to bring back the use of robes in their meetings and ceremonies." [JA85]. "[T]his information became public," said President Cordano, "triggering many members of the Gallaudet community." [JA85]. The University's chapter of Hillel, for example, was "deeply disturbed by the actions of Kappa Gamma fraternity members involving making a salute and wearing hooded robes, as well as the photographs of these actions." [JA103]. "The salute and robes," its Director and board members wrote, "have become well-known symbols of neo-Nazi, antisemitic, and white supremacist organizations." [*Id.*]

An immediate investigation concluded that Kappa Gamma had violated the 2015 policy, and the chapter was suspended. [JA85]. They were not suspended because of old photos, President Cordano later clarified. [*Id.*]

---

well as 'documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss.'") (quoting *Xiaobing Liu v. Blinken*, No. 21-cv-629, 544 F.Supp.3d 1, 8 (D.D.C. June 18, 2021) (quoting *Feng Wang v. Pompeo*, No. 18-cv-1732, 2020 WL 1451598, at *3 (D.D.C. Mar. 25, 2020)).

Ten plaintiffs filed the original Complaint on June 9, 2021, alleging

defamation.  On June 16 and 17, however, six of them voluntarily withdrew their

claims.  On October 25, 2021, all Defendants filed motions to dismiss the

Complaint.  Rather than oppose the motions, the four remaining plaintiffs elected

to file their Amended Complaint, adding claims for defamation by implication and

false light.  All Defendants again moved to dismiss.

The District Court granted the motions to dismiss, with prejudice, on July

15, 2022.  Judge Christopher Cooper held that "[b]ecause none of [the] challenged

statements concern the individual plaintiffs, and others are also either non-

actionable opinion or concededly true, the Court will grant the motion and dismiss

the case." [Memorandum Opinion at 2; JA130].

## SUMMARY OF THE ARGUMENT

This case asks whether Gallaudet University President Cordano's address to

the University community, opining on the critical and urgent issue of racism on a

college campus, is protected speech under the First Amendment or subjects her to

liability for defamation.  Commenting on social media reaction to recent events

involving the Kappa Gamma fraternity, President Cordano described Kappa

Gamma as having become "the face of systemic racism" at Gallaudet.  She neither

named nor in any way singled out any individual, much less any of the four

Plaintiffs, alumni from three decades earlier.

6

Plaintiffs fail to state a cause of action in defamation law.  President

Cordano's remarks were not "of and concerning" Plaintiffs; they were at most

"group defamation," with no special application to any member of the group and

not actionable by any of them.  Her commentary was also classic opinion—

figurative, rhetorical language that cannot be objectively verified—and not an

actionable false statement of fact.  Courts have consistently held that similar

assertions of racism or bigotry cannot support a defamation claim. As such, "the

face of systemic racism" did not create a cause of action for these four Kappa

Gamma alumni.  The District Court correctly dismissed the Amended Complaint.

## STANDARD OF REVIEW

This Court reviews de novo a district court's decision granting a motion to

dismiss under Federal Rule of Civil Procedure 12(b)(6).  *Kim v. United States*, 632

F.3d 713, 715 (D.C. Cir. 2011).

"'The Supreme Court has directed courts to expeditiously weed out

unmeritorious defamation suits.'"  *BYD Co. Ltd. v. All. for Am. Mfg.*, 554 F.Supp.3d

1, 6 (D.D.C. 2021) (quoting *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109

(D.C. Cir. 2017) (cleaned up)).  "Early resolution of defamation cases under Federal

Rule of Civil Procedure 12(b)(6) not only protects against the costs of meritless

litigation, but provides assurance to those exercising their First Amendment rights

7

that doing so will not needlessly become prohibitively expensive." *Id.* (citation and internal quotation marks omitted).

To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual allegations that, accepted as true, state a plausible claim for relief. *Davis v. Wernick*, No. 19-cv-3327, 2021 WL 310999, at \*2 (D.D.C. Jan. 29, 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The court may consider the factual allegations in the complaint, documents attached to or incorporated in the complaint, matters under judicial notice, and matters of public record. *Davis*, 2021 WL 310999, at \*2 (citations omitted).

While there is no heightened pleading standard for defamation claims in the District of Columbia, *see Croixland Props. Ltd. P'ship v. Corcoran,* 174 F.3d 213, 215 n. 2 (D.C. Cir. 1999), such claims must be pleaded with particularity and specify the person or persons to whom the statements were made or published. *Coates v. Law School Admission Council,* Civil Action No. 05–0641, 2005 WL 3213960 at \*2 (D.D.C. October 25, 2005) (citing *Wiggins v. Dist. Cablevision, Inc.,* 853 F.Supp. 484, 494 (D.D.C. 1994**)).**

"The Court may affirm a district court judgment on any ground the record supports and that the opposing party had a fair opportunity to address." *Abbas v. Foreign Pol'y Grp., LLC,* 783 F.3d 1328, 1337 (D.C. Cir. 2015).

## ARGUMENT

## I.    THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' CLAIM FOR DEFAMATION.

A claim for defamation must allege "(1) that the defendant made a *false* and defamatory statement *concerning the plaintiff*; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Close It! Title Servs., Inc. v. Nadel*, 248 A.3d 132, 139 (D.C. 2021) (emphasis added) (affirming dismissal of defamation claim); *Luhn v. Scott*, 2019 WL 5810309, at *3 (D.D.C. Nov. 7, 2019), *aff'd*, 843 F. App'x 326 (D.C. Cir. 2021) (quoting *Coles v. Wash. Free Weekly, Inc.*, 881 F. Supp. 26, 30 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996)).

Plaintiffs' case suffers from two fatal flaws.  First, it is barred by the doctrine of "group defamation."  Plaintiffs fail to allege specific facts to demonstrate that President Cordano's statements about Kappa Gamma could be construed as "of and concerning" them individually, as opposed to the fraternity itself.  None alleges that President Cordano named, described, or otherwise identified him, or that her comments applied "solely or especially" to him. *Browning v. Clinton,* 292 F.3d 235, 247 (D.C. Cir. 2002).

9

Second, President Cordano's statements were First Amendment-protected expressions of opinion.  To state a cause of action for defamation, Plaintiffs must allege, at a minimum, a verifiably false statement of fact.  They have not done so.  Courts have consistently held that figurative, rhetorical speech, including commentary about racism and bigotry, reflects the speaker's subjective judgment, not the objectively false statement of fact that the law of defamation is intended to redress.  No matter how wronged or wounded its target may feel, he or she has no cause of action for defamation.  The same is true of these four Plaintiffs.

The District Court correctly granted the motions to dismiss "[b]ecause none of the challenged statements concern the individual plaintiffs, and others are also either non-actionable statements of opinion or concededly true…"  [Memorandum Opinion at 2; JA130].

## A.     President Cordano's Statements Were Not "Of and Concerning" Plaintiffs.

President Cordano's statements about "Kappa Gamma" give these Plaintiffs no cause of action for defamation.  Under the group defamation doctrine, a defamatory statement directed at a group or class does not generally give rise to a claim on behalf of its members; the plaintiff "must show that the allegedly defamatory statement was published 'of and concerning' him."  *Alexis v. District of Columbia,* 77 F. Supp. 2d 35, 40 (D.D.C. 1999).  "In a case of a[n allegedly] defamatory publication directed against a class, without in any way identifying

10

[any] specific individual, no individual member of the group has any redress." *Id.* at 42 (quoting *Fowler v. Curtis Pub. Co.*, 182 F.2d 377, 378 (D.C. Cir. 1950)) (internal quotation marks omitted).

"Stated generally, '[d]efamation is personal. . . . Statements which refer to individual members of an organization do not implicate the organization. By the same reasoning, statements which refer to an organization do not implicate its members.'" *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1089 (D.C. Cir. 2007) (citations omitted; alteration in original).

*Service Parking Corp. v. Wash. Times Co.*, 92 F.2d 502 (D.C. Cir. 1937), illustrates that there must be some specific application of the defamatory matter to the individual plaintiff; the plaintiff must be able to show that "the words referred solely or especially to himself." 92 F.2d at 504. In that case, the plaintiff sued for libel based on an article in which the Superintendent of Police criticized parking lot owners for placing cars on the streets instead of leaving them in the lots. *Id.* at 503. He stated that he would confer with the District Attorney's office to stop the "chiseling" and see whether lot owners could be charged with "conducting an illegal business" or "obtaining money under false pretenses." *Id.*

The plaintiff showed that the article complained of 20-30 parking lots operated by 10-12 owners, and that he was the owner and operator of nine of the lots. *Id.* The trial court granted the defendant's motion for a directed verdict,

11

holding that the jury could not reasonably understand the article to refer to the plaintiff.  *Id.*  This was so even though the plaintiff offered a witness to testify that he read the article to mean the plaintiff was guilty of the conduct described.  *Id.*

This Court affirmed.  "It was necessary for [the plaintiff] to prove that the defamatory words referred to him."  *Id.* at 504.  The defamatory words must refer to "some ascertained or ascertainable person, and that person must be the plaintiff."  *Id.*  (quoting Odgers, *Libel and Slander* (6th Ed. 1929) at 123) (citation omitted).  The Court concluded that the plaintiff had failed to show that the article referred to him.  *Id.* at 506.  *See also Riss & Co., Inc. v. Ass'n of Am. R.R.*, 187 F. Supp. 323, 325-26 (D.D.C. 1960) (because article referred only to "railroads" as a class, counterclaim for defamation alleged no application to "some ascertained or ascertainable person").

Plaintiffs here allege that "attacks upon them and sudden investigations of them confirmed" that they "were the individuals being referred to" by President Cordano.  [AC ¶ 218; JA58].  But no reasonable listener could conclude that President Cordano had accused Steven Florio, Patrick Costello, William Millios, or Timothy Mallach—thirty years after they were students on campus—of being "the face of systemic racism" at Gallaudet in 2020. And *post hoc* guilt by association— which could have been suffered by any current or former member of the fraternity—cannot overcome the group defamation rule.  Nor is it enough that "a

listener could have gone on to find out who comprised the group." *Alexis*, 77 F. Supp. 2d at 43.

To avoid the group defamation rule, a member of the group must show either that (1) the "small group" exception applies—*i.e.*, "each and every member of the group or class is referred to"—or (2) "the circumstances of publication reasonably give rise to the conclusion that there is *particular reference* to the member." *Id.* at 40-41. The Amended Complaint does neither.

### 1.    The small group exception does not apply to Costello or Millios.

Plaintiffs do not dispute that DC law applies the group defamation doctrine in determining whether an allegedly defamatory statement is "of and concerning" an individual plaintiff. Nor do they dispute that the group defamation doctrine applies to Kappa Gamma itself—the only explicit subject of President Cordano's "face of systemic racism" language. Instead, they argue, first, that the District Court should have applied the small group exception to Costello and Millios, who were pictured in the 1989 "salute" photograph. Appellants' Brief ("App. Br.") at 29. This argument fails on several levels.

A small group, for purposes of this exception, typically is not more than 20 to 30 members under DC law. *Alexis,* 77 F. Supp. 2d at 41. "Conversely, when a group consists of more than about 25 people, the courts have traditionally found that defamation of the group does not constitute defamation of a particular group

13

member who was neither named nor singled out in the remarks." *Id.* Cases from other jurisdictions have established a "consistent rule of thumb" that unnamed group members generally are not permitted to sue for group defamation if the group has more than 25 members and "almost invariably" are not permitted to sue if the group has more than 100 members. *Id.*

Here, Plaintiffs contend that the District Court should have applied the small group exception to the group of 34 depicted in the salute photo, including Costello and Millios, in part because that number is "hardly a significant increase" over the "rule of thumb." App. Br. at 31. But they concede that the District Court did not hold the exception inapplicable on the basis of group size alone, *id.* at 32, and that it applied no "bright-line rule," *id.* at 31, that an individual member of a group of more than 25-30 can never sue for defamation.

DC law includes no "close enough" threshold for application of the small group exception. As a widely applied rule of defamation law, any exception to the group defamation doctrine should be narrowly construed. *Alexis,* 77 F. Supp. 3d at 41. The District Court correctly so held. [Memorandum Opinion at 8; JA136].

President Cordano made no reference "solely or especially" to the students in the thirty-year-old salute photo as "the face of systemic racism" at Gallaudet. Although she noted that "photographs of the salute" were "being shared on social media," she did not publish any such photograph, made no other factual statement

14

about the content of any photograph, and did not identify anyone in it.  She made no statement about the photograph that was false or defamatory.

Plaintiffs base much of their argument on an artificial reading of President Cordano's words.  They contend that, in ASL in the vlog (as opposed to the transcript), she singled out the former students in the photograph by using the words "Kappa Gamma," "pictures distributed on social media," and "they" in that order.  [AC ¶¶ 127-29; JA33-34]. According to Plaintiffs, this syntax and the word "they" "immediately references those in the photograph"; thus, Costello and Millios are "directly implicated."[5]  App. Br. at 17.

The word "[t]hey," however, will not bear the weight Plaintiffs load on it here. "They," in this unattributed interpretation of the video, more likely refers to Kappa Gamma than to "pictures." And Plaintiffs allege no facts to support the notion that "[t]hey," even if it connotes individuals rather than the fraternity, includes Kappa Gamma alumni—much less alumni from decades ago, such as these four.  The only plausible reading of her statements, in context, is that Kappa Gamma itself had become "the face of systemic racism" in the public perception.

The Supreme Court, in *New York Times Co. v. Sullivan*, 376 U.S. 254, 256-57 (1964), held that a similar use of the word "they" did not give rise to an

---

[5]  This discussion appears only in the fact section of Plaintiffs' brief.  They do not return to it in the argument or provide any legal authority for their position.

individual plaintiff's defamation action.  Sullivan, Commissioner of Public Affairs

for the City of Montgomery, Alabama, alleged that he was defamed by a full-page

advertisement in *The New York Times,* entitled "Heed Their Rising Voices."  The

advertisement reported that non-violent student demonstrators in the city had been

subjected to a "wave of terror" by the police.  It also solicited money for the

defense of Dr. Martin Luther King, Jr. against a pending perjury indictment in

Montgomery.

Among the allegedly defamatory statements in the advertisement, Sullivan

pointed to this paragraph:

> Again and again the Southern violators have answered
> Dr. King's peaceful protests with intimidation and violence.
> They have bombed his home almost killing his wife and child.
> They have assaulted his person.  They have arrested him seven
> times—for 'speeding,' 'loitering' and similar 'offenses.' And
> now they have charged him with 'perjury'—a *felony* under
> which they could imprison him for *ten years* . . . .

376 U.S. at 257-58.  Sullivan contended that "they" would be read to refer to the

Montgomery police and, in turn, to him as the Commissioner supervising the

police.  He presented six witnesses who testified at trial that they associated

statements in the advertisement with Sullivan in his capacity as Commissioner.  *Id.*

at 258.

16

Despite this testimony, the Supreme Court held that the evidence was "incapable of supporting the jury's finding that the allegedly libelous statements were made 'of and concerning' [Sullivan]." *Id.* at 288.  Said the Court:

> There was no reference to respondent in the advertisement, either by name or official position.  A number of the allegedly libelous statements—the charges that the dining hall was padlocked and that Dr. King's home was bombed, his person assaulted, and a perjury prosecution instituted against him—did not even concern the police; *despite the ingenuity of the arguments which would attach this significance to the word 'They,' it is plain that these statements could not reasonably be read as accusing respondent of personal involvement in the acts in question*.

*Id. at* 288-89 (emphasis added).

Here, similarly, President Cordano's words "could not reasonably be read as accusing" these four plaintiffs of "personal involvement" in the 2020 controversy about campus racism.  Plaintiffs stretch their logic too far when they allege that President Cordano's mention of "pictures" necessarily defames Plaintiffs Costello and Millios.  Nothing in the Amended Complaint alleges that President Cordano was accusing Costello and Millios in particular of being "the face of systemic racism" at Gallaudet; for that matter, Plaintiffs do not allege that she even knew they existed.

In context, the phrase "photographs…being shared on social media" does not limit, by any fair reading, the "Kappa Gamma" that "have become the face of systemic racism" to the students in a 30-year-old photograph.  Rather, it merely

17

explains how Kappa Gamma recently came to be a subject of social media controversy about racism at Gallaudet.

The word "they" is extraneous, then; it does not limit or modify "Kappa Gamma" in the sentence. President Cordano could have said, "Kappa Gamma, especially the alumni pictured in the salute photo, have become the face of systemic racism" in the community. She did not.

Regardless of Plaintiffs' undue focus on the word "they," in short, the general reference to Kappa Gamma is not "of and concerning" Plaintiffs as a matter of law. "Allegations of defamation by an organization or group and its members are not interchangeable. Statements which refer to an organization or group do not necessarily implicate its members." *Alexis* 77 F. Supp. 2d at 40.

Plaintiffs next argue that having declined to apply a bright-line numerical limit on the small group exception, the District Court "should have ended any further inquiry" and held that President Cordano's comments were "of and concerning" three of the plaintiffs. App. Br. at 33. This is a non sequitur. Even if a bright-line rule is not employed to rule out a group defamation claim, the converse—that the small group exception necessarily does allow an individual cause of action—doesn't follow. If that were true, the "rule of thumb" would not be a rule at all.

18

Perhaps most important, Plaintiffs offer no compelling reason why "the face of systemic racism" should be read to accuse Costello and Millios, or even Florio and Mallach, as opposed to the fraternity itself.  If anything, President Cordano was responding to the actions of *current* student members of the fraternity on campus.[6]  She addressed Kappa Gamma's *recent* use of robes that had been banned from campus and the newest re-emergence of the salute photo.  She commented only on current events.  She spoke in the present tense:  Kappa Gamma "have become" the face of systemic racism in the community.  She addressed the community at a unique moment in history: with the death of George Floyd and the resulting Black Lives Matter protests, Kappa Gamma produced a fresh outcry on social media.  Nothing in her language singled out any 1989 member of Kappa Gamma as a distinct target of her opinion.

Rather, "[p]utting the size of the group aside," the District Court correctly held that President Cordano's address was 'about the suspension of *Kappa Gamma* generally."  [Memorandum Opinion at 10; JA138] (emphasis in original).  "In sum," said the Court, the challenged statements are about Gallaudet's Kappa Gamma chapter as a whole, not about any one member" [Memorandum Opinion at 11; JA139], and no reasonable person could infer that President Cordano was

---

[6]  No student member of Kappa Gamma in 2020 has ever been a plaintiff in this case.

19

accusing Plaintiffs of being "the face of systemic racism" in the community "as opposed to the broader fraternity chapter to which they belong." [*Id.*]

Plaintiffs offer no more plausible reading of President Cordano's address to the Gallaudet community. She did not refer "solely or especially," *Browning,* 292 F.3d at 248, to Costello or Millios. This Court should reach the same decision as the District Court did.

**2.    The small group exception does not apply to Florio's case of mistaken identity.**

Plaintiffs stretch logic even further when they argue for application of the small group exception to Florio. To state the obvious, Florio, who was admittedly *not* in the thirty-year-old salute photograph, was not even a member of the group Plaintiffs contend President Cordano's remarks were "of and concerning." President Cordano clearly made no statement about him, much less a false and defamatory one.

Instead, Plaintiffs argue that Florio was tainted by the same photograph because a colleague *mistakenly* believed he was in it, leading to his termination from employment. This circumstance may give Florio a cause of action against his former employer—and he brought one—but it clearly does not meet the fundamental "of and concerning" element of a defamation claim.[7]

---

[7] In a lawsuit arising out of his termination as Commissioner for the Massachusetts Commission of the Deaf and Hard-of-Hearing, Florio alleged that the harm he

Plaintiffs turn their own argument for the small group exception on its head when they try to bring Florio into the fold. As to Costello and Millios, they allege that it was because of their *presence* in the photograph that they may sue for defamation; as to Florio, they argue that he may sue *despite his absence* from the group in the photograph. If President Cordano intended "they" to mean those in the photograph, she certainly could not have been speaking "solely or especially" about alumni who were *not* in the photo. Stated differently, though Plaintiffs argue that President Cordano's comments were "of and concerning" Florio as a matter of law, they were not about him as a matter of fact.

Even if the "salute picture" group could create a "small group exception" allowing the defamation claims of Plaintiffs Costello and Millios, it could not do

---

suffered began even before President Cordano addressed the Gallaudet community. In *Florio v. Commonwealth of Massachusetts, et al.,* Civil Action No. 1:21-cv-10665-IT (D. Mass. March 7, 2022), the District Court quoted the amended complaint as alleging that a blogger mistakenly identified Florio in the salute photograph on June 5, 2020—four days *before* President Cordano's vlog. Dkt. 27 at 3. The blogger claimed that "the fraternity's salute was affiliated with the Nazi salute." That is, the blogger independently viewed the salute as Nazi-like without any prompting from President Cordano, who had not yet spoken about any photograph and never compared the salute to a Nazi salute, or from *The Washington Post,* which had not yet published any article making that comparison. *Id.* Florio alleged in the Massachusetts case that the June 5 blog—not President Cordano's June 9 vlog—set in motion the investigation that led to his termination as Commissioner. *Id.* at 3-5. The amended complaint also alleged that the termination letter "cited internal complaints unrelated to Florio's fraternity membership as the reason for his termination." *Id.* at 5. The court dismissed the amended complaint on March 8, 2022. Dkt. 28.

21

so as to Plaintiff Florio.  To permit his claim to go forward based on a wholly

incorrect—and therefore not "reasonable"—identification would replace the

"particular reference" requirement, *Alexis* 77 F Supp. 2d at 40, with a "mistaken

identity" test for the "of and concerning" element of defamation.

*Croixland Props. Ltd. P'ship v. Corcoran*, 174 F.3d 213 (D.C. Cir. 1999),

cited by Plaintiffs, does not turn Florio's case of mistaken identity into a viable

cause of action for defamation. The fact scenario there was the opposite of this

one.  Florio alleges that he is entitled to sue in defamation for a statement that was

not actually about him at all.  But in *Croixland*, it was clear that the allegedly

defamatory statements were, in fact, describing Croixland Properties, "the owner"

of the facility, even though unnamed or mistakenly referenced as another corporate

entity.

That was exactly the basis of this Court's decision—that Croixland was

indeed the intended subject of the alleged defamation.  174 F.3d at 217 ("Insofar as

Croixland was the true owner, even if never named, it could be defamed in its

status as the owner."); *id.* ("a reference to 'the owner of the track' could reasonably

be understood to mean Croixland even if the listener did not know Croixland by

name"). Here, to the contrary, "Kappa Gamma" could not reasonably be

understood to mean Florio.[8]

### 3. The District Court did not err in holding that Florio and Mallach failed the "of and concerning" test on group defamation grounds.

Plaintiffs offer little argument against the District Court's holding that the

claims of Florio and Mallach "fail the threshold element of defamation" and that it

could "easily dispose" of them under the group defamation doctrine. This Court

should reach the same decision.

As demonstrated above, Florio has no reasonable claim to the small group

exception; Mallach apparently makes no such claim on appeal. Thus, the District

Court was clearly correct in holding that "[t]heir sole connection to the statements

is that they were in Kappa Gamma; that does not 'reasonably give rise to the

---

[8] This Court may also affirm dismissal of Florio's case on the ground that it did not survive his death. App. Br. at i. Defamation claims do not survive the death of the allegedly defamed plaintiff. *Waldon v. Covington*, 415 A.2d 1070, 1077 (D.C. 1980) ("defamation . . . does not survive decedent's death"); *Wender v. Hamburger*, 393 F.2d 365, 366 (D.C. Cir. 1968) (same); *Shearer v. Bakery & Confectionery Workers' Int'l Union of Am.*, 294 F.2d 235, 235 (D.C. Cir. 1961) (same). Although the survival statute has been amended since *Waldon*, removing the bar to recovering pain and suffering damages in personal injury actions, no case has held that the amendment altered the law as to defamation claims. *See, e.g.*, Robert D. Sack, *Defamation: Libel, Slander, and Related Problems*, § 2:10.1. (5th ed. 2017) (citing *Shearer* as current law in the District); *Rice v. Washington Clinic, Chartered,* 961 F.2d 964 (D.C. Cir. 1992) (unpublished opinion vacating and remanding dismissal of defamation claim for district court to consider legislative history of revised statute).

23

conclusion that' the statements about the larger group make '*particular reference*'
to them as former student members."  [Memorandum Opinion at 8; JA136].

Against this incontestable reasoning, Plaintiffs offer only a single conclusory
argument: that "the individual plaintiffs could satisfy the 'of and concerning'
element of defamation in other ways."  App. Br. at 35.  Plaintiffs do not identify
those "other ways" in this section of their argument.  Accordingly, the Gallaudet
defendants address the broader issue of group defamation under the next
subheading.

> **4.      The District Court correctly ruled that President Cordano's
> remarks could not reasonably be read to accuse Florio,
> Costello, Millios, or Mallach of being "the face of systemic
> racism" at Gallaudet in 2020.**

Did President Cordano accuse four alumni from thirty years ago of being
"the face of systemic racism" at Gallaudet in 2020?  Plaintiffs argue that
"reasonable listeners, viewers, and readers" could and did interpret her address to
the University community that way.  But they do not dispute that, even beyond its
current student membership, the group of Kappa Gamma alumni numbered in the
hundreds or thousands.  The Amended Complaint presents no compelling case that
President Cordano had Florio, Costello, Millios, or Mallach, as opposed to their
fraternity or any other members, in mind.  She said nothing about remote Kappa
Gamma alumni.  She did not so much as allude to any Plaintiff.

Plaintiffs point out that they allegedly lost employment or business revenue, in temporal proximity to President Cordano's address, when some persons associated them with Kappa Gamma. But guilt by association is not the "special application" required by the case law. Besides, this argument conflates harm—a separate element of a cause of action for defamation—with the "of and concerning" requirement.

That some of their professional colleagues or employers shunned Plaintiffs does not mean that President Cordano's remarks were "of and concerning" them as a matter of law. While others may have recognized Plaintiffs as former Kappa Gamma members, and, for reasons of their own, held it against them, Plaintiffs do not plausibly allege that they were "solely or especially" the subjects of, or "particularly referenced" in, President Cordano's comments.

*Croixland* does not stand for the proposition that a listener's response to an allegedly defamatory statement—reasonable or unreasonable—can alone create a "particular application" to an individual member of a group. Indeed, the group defamation doctrine was not at issue in *Croixland*. As discussed above, the plaintiff in *Croixland* actually was the intended target of the plaintiff's statement. It "suffice[d] that the speaker referred to the plaintiff "by description" precisely because the plaintiff was in fact the "the owner" of the facility, even if referred to under the name of another corporate entity or not named at all.

*Vasquez v. Whole Foods Mkt., Inc.,* 302 F. Supp. 3d 36 (D.D.C. 2018), also does not support Plaintiffs' position.  It states the unexceptionable principle that the "of and concerning" inquiry may look to extrinsic evidence of whether reasonable listeners concluded that a statement referred "solely or especially" to the plaintiff.  *Id.* at 64 (quoting *Browning* 292 F.3d at 247).  But the facts of *Vasquez,* too, are quite different from those here.  The court in *Vasquez* emphasized that the individuals referred to in the allegedly defamatory statements were readily identifiable to their immediate co-workers:

> [I]t does not require a large inferential leap to think it plausible that, at a minimum, Plaintiffs' colleagues at Whole Foods stores would have known about their terminations and, if they had heard Buchanan's statements, reasonably believed that they referred to Plaintiffs.  After all, as here, when the termination and its publication coincide, it should come as no surprise to the employer that the terminated employee's co-workers would attribute the public statement and the stated reason for firing to their departed colleague.

*Id*.

Once again, the allegations in Plaintiffs' Amended Complaint are quite different.  The statements in *Vasquez* were explicitly about individuals.  They were applicable only to a small, discrete group of readily identifiable people.  The only real question was who could reasonably discern their identities.

Here, the allegedly defamatory statements were explicitly directed at the group, Kappa Gamma, not at individuals. The District Court correctly recognized

26

that the issue is not whether these Plaintiffs belonged to Kappa Gamma, or whether any of them was depicted in a thirty-year-old photograph.  Rather, it was whether President Cordano was "accusing [*them*] of being the face of systemic racism in the Gallaudet community," and whether her comments were about them "*as opposed to the broader fraternity chapter* to which they belong." [Memorandum Opinion at 11; JA at 139] (alteration and emphasis added).

That each Plaintiff alleges harm at the hands of those who chose not to associate any longer with former Kappa Gamma members—whether they saw President Cordano's address or only social media postings— does not alone satisfy the "of and concerning" requirement.  As discussed above, the plaintiffs in both *New York Times v. Sullivan* and *Service Parking* offered testimony that witnesses had associated the allegedly defamatory statements with the plaintiffs.  Yet neither court was persuaded by the testimony that the offending statements were "of and concerning" them.  Looking instead to the allegedly defamatory language itself, both courts held that the speakers had made no particular reference to the plaintiffs. The same is true here.

Indeed, Plaintiffs' allegations of harm fall short of showing that President Cordano targeted them as "the face of systemic racism":

- As shown above, any connection with Florio was unfounded, and he has alleged elsewhere that he was mistakenly identified in the salute photograph even *before* President Cordano addressed the Gallaudet community and *before* the *Post* covered the story.  President Cordano published no

27

photograph and made no mention of Florio in connection with any photograph. Florio's accuser, therefore, could only have drawn his mistaken conclusion from viewing the photograph itself, not from President Cordano.

- Costello quotes his school administrator as notifying students' families that he was terminated because of a photo that "included an employee of The Learning Center for the Deaf." App. Br. at 44. Once again, it was not President Cordano who published the photograph or identified Costello in it; the administrator could have identified him only by seeing the photograph, which President Cordano stated had "circulated on social media." [JA116]. And the administrator described the fraternity brothers in the photo as "using the raised hand Nazi salute." This, too, could not have come from President Cordano, who never described the photo, in her remarks to the Gallaudet community, as depicting a Nazi salute.

- Millios offers only a conclusion: he lost his employment because "the Deaf Community and his employer understood the defamatory statements and reports to pertain to him." App. Br. at 45; [*see also* AC ¶ 262; JA65].

- Mallach pleads only that a donor "observed [his] involvement" in some unspecified way and "sent a threatening letter," undescribed, to his employer. [AC ¶ 272; JA67]. On appeal, he adds only the purely conclusory allegation that government officials in Canada "ceased to use his services as even the Deaf Community in Canada understood the defamatory statements and news reports to pertain to him." App. Br. at 45.

In sum, Plaintiffs fail to demonstrate that President Cordano's remarks applied "solely or especially" to them. This Court should affirm the District Court's holding that the small group exception does not provide a cause of action in defamation for Florio, Costello, Millios, or Mallach.

28

**B.    "The Face of Systemic Racism" Is First Amendment-Protected Opinion, Not A Verifiably False Statement Of Fact.**

**1.    "The face of systemic racism" is inherently figurative and rhetorical, not objectively verifiable.**

To state a viable claim for defamation, Plaintiffs must allege that Defendants made a *factual* statement that was verifiably *false.*  The law of defamation distinguishes statements that are objectively true from those that are objectively false; it does not referee differences of opinion.  As the Supreme Court of Delaware recently wrote in affirming dismissal of a claim that "shockingly racist" is actionable defamation, objective verifiability is "the *sine qua non* of defamation actions." *Cousins v. Goodier*, 283 A.3d 1140, 1156 (Dela. 2022).  Plaintiffs have pleaded nothing of the sort.

"A statement of opinion that 'does not contain a provably false factual connotation' is not actionable under the First Amendment, and receives 'full constitutional protection.'"  *Montgomery v. Risen*, 197 F. Supp. 3d 219, 247-49 (D.D.C. 2016) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) ("The assertion that [Plaintiff] was motivated [by] greed or ambition is a subjective judgment that is not verifiable. . . . [Defendant's] own subjective opinion that [Plaintiff] is a con artist is also a non-actionable opinion."), *aff'd,* 875 F.3d 709 (D.C. Cir. 2017).  *See also Ruifang Hu v. K4 Sols., Inc.*, No. 18-cv-1240, 2020 WL 1189297, at *13 (D.D.C. Mar. 12, 2020) ("Expressions of opinion can be

29

actionable only if they imply a provably false fact, or rely upon stated facts that are provably false.") (internal quotation marks and citation omitted).

Far from being a proper subject of a defamation claim, President Cordano's opinions about Kappa Gamma are protected speech. "However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323, 339-40 (1974).[9]

President Cordano's judgment that Kappa Gamma was viewed by others as "the face of systemic racism" at Gallaudet was purely rhetorical— her subjective, figurative characterization of the social media reaction to the salute photo and the resumed use of banned ceremonial robes. It is not susceptible to the objective proof or disproof that distinguishes actionable defamation from non-actionable opinion. It cannot be deemed true or false.

But President Cordano's portrayal of Kappa Gamma as "the face of systemic racism" is even one more step removed from defamation: it was *her* opinion about

---

[9] The Amended Complaint implicitly acknowledges that only a false statement of fact, and not an opinion, can constitute defamation. Plaintiffs allege, for example, that President Cordano's statements "were intended to be and were understood to be statements of fact and not opinion." [AC ¶ 190; JA53]. But these purely conclusory assertions are unsupported by any factual allegations and thus should not be accepted as true for purposes of this motion. *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002). Whether a statement is fact or opinion is an issue of law for the court to decide. *Sigal Constr. Corp. v. Stanbury*, 586 A.2d 1204, 1210 (D.C. 1991)

*public* opinion.  It was her color commentary on the subjective views of *others.*
The fraternity had come to be associated in the public mind with racism; others on
campus and in the social media audience viewed it that way. If calling out "racism"
is a subjective and debatable viewpoint, identifying "the face of" racism is all the
more so.

The Supreme Court has recognized that figurative language is typically
indicative of opinion rather than fact.  *Milkovich,* 497 U.S. at 21 ("loose, figurative,
or hyperbolic language which would negate the impression that the writer was
seriously maintaining that petitioner committed the crime of perjury"); *see also*
*Bauman v. Butowsky*, 377 F. Supp. 3d 1, 13 (D.D.C. 2019) ("Here again, '[c]ontext
is crucial,' as it 'can turn what, out of context, appears to be a statement of fact into
"rhetorical hyperbole," which is not actionable.'") (alteration in original) (quoting
*Ollman v. Evans*, 750 F.2d 970, 1000 (D.C. Cir. 1984) (Bork, J., concurring).[10]

President Cordano's use of the phrase "the face of systemic racism" is
quintessentially figurative or rhetorical.  Calling someone "the face of," for
example, a product, political party, business, or sports franchise entails no
statement that can be proved true or false; reasonable people can disagree about

---

[10]  Even the *denial* of an allegation of racism often comes in figurative language—
*e.g.*, "I don't have a racist bone in my body"—precisely because it is not
susceptible to the binary "true or false" analysis that distinguishes fact from non-
actionable opinion in defamation law.

who deserves that title.  And "face" is used in a plethora of metaphorical and idiomatic phrases ("at face value," "fly in the face of," "on its face," "tell him to his face," "do an about-face," "save face," "face off," "two-faced," "with a straight face," "face up to it," "come face to face").  *See, e.g.*, *Tagliaferri v. Szulik*, No. 15 Civ. 2685, 2016 WL 3023327, at *2 (S.D.N.Y. May 25, 2016) (colorful language such as "'face of evil'" not actionable).

Plaintiffs themselves use this figurative phrase in the Amended Complaint. They call President Cordano the "face of the Deaf community world-wide."  [AC ¶ 26; JA13] [*see also* AC ¶ 141; JA37].  They do so for obvious rhetorical effect—to persuade the Court of the power of her words to harm them—and not because the phrase can be taken literally.[11]

This Court could stop right there, holding that "the face of systemic racism" is so inherently rhetorical or figurative that no further analysis is needed to deem it non-actionable.  But even Plaintiffs' additional arguments about the phrase as demonstrably false are misguided.

---

[11]  The District Court was recently quoted as using the phrase, in much the same way as President Cordano did, while sentencing one of the January 6 Capitol rioters: "'For better or worse, you've become one of the faces of January 6,' U.S. District Judge Christopher R. Cooper of D.C. told Jenna Ryan, 50."  *She said she wasn't going to jail for Jan. 6, citing "blonde hair white skin."  A judge sentenced her to 60 days behind bars,* https://www.washingtonpost.com/local/legal-issues/jenna-ryan-jail-capitol-jan-6/2021/11/04/c94cd8c2-3d82-11ec-8ee9-4f14a26749d1_story.html**.**

## 2.    *Milkovich* does not make "the face of systemic racism" actionable.

Plaintiffs argue that the "face of systemic racism" is actionable defamation under *Milkovich v. Lorain Journal Co.,* 497 U.S. 1 (1990).  They contend that President Cordano's remarks rely on undisclosed or incorrect facts, and that they were therefore "capable of being proven true or false."  App. Br. at 49.  This argument misconstrues both President Cordano's statement and the import of *Milkovich.*

The plaintiff in *Milkovich*, a high school wrestling coach, alleged that he was defamed by a report in an Ohio newspaper that he had lied in an athletic association hearing about an altercation at a wrestling match.  The Supreme Court in *Milkovich* held that what is "labeled an opinion" may actually imply an assertion of objective fact, and might be actionable if the facts implied are incorrect or incomplete. 497 U.S. at 18.   But the Court also contrasted a statement, like President Cordano's, "which does not contain a *provably false* connotation," holding that the latter "will receive full constitutional protection."  *Id.* at 20 (emphasis added).  The Court in *Milkovich* stressed that even factual-sounding accusations such as "blackmail" or "traitor" are not actionable when used as

33

"rhetorical hyperbole," "vigorous epithet," or "lusty and imaginative expression." *Id*. at 16-17. [12]

The *Milkovich* Court concluded that "the connotation that petitioner committed perjury is sufficiently factual to be susceptible of being proved true or false." *Id.* at 21.  Whether Milkovich lied, the Court pointed out, could be determined by comparing his testimony at the athletic association hearing with his later testimony at trial of an action for a restraining order.  "'Unlike a subjective assertion,'" the Court held, "'the averred defamatory language is an articulation of an objectively verifiable event.'"  *Id.* at 22.

*Milkovich* means that a plaintiff may be defamed by verifiable factual assertions, express or implied, disclosed or undisclosed, that form the basis of the "opinion."  In such a circumstance, what the defendant labels "opinion" may indeed have a "provably false connotation."  But *Milkovich* does *not* mean that every implied, undisclosed, or background fact, even one that is non-defamatory or not foundational to the opinion, can give rise to an action in defamation.

---

[12] Plaintiffs argue, citing *Milkovich,* that the District Court erred in "assum[ing] there is a wholesale exemption from liability for 'opinion.'"  App. Br. at 48.  The District Court did no such thing.  It explicitly acknowledged the holding in *Milkovich* that "statements of opinion can be actionable if they imply a provably false fact, or rely upon stated facts that are provably false."  [Memorandum Opinion at 12-13; JA140-41].

"Expressions of opinion are entitled to constitutional protection unless they imply the existence of undisclosed defamatory facts as the basis of the opinion." *Myers v. Plan Takoma, Inc.*, 472 A.2d 44, 47 (D.C. 1983). In an effort to bring "the face of systemic racism" within the reach of defamation under *Milkovich*, Plaintiffs allege that President Cordano's characterization of Kappa Gamma relied on undisclosed "new information." [AC ¶ 131; JA34]. Not so. She never suggested that "new information" led her to opine that Kappa Gamma was perceived as "the face of systemic racism."

Rather, as Plaintiffs quote her, new information "led to many people calling for attention to Kappa Gamma" or "led to renewed demands for change with Kappa Gamma." [AC ¶¶ 125-126; JA32-33]. And neither of these is alleged to be false or defamatory. The vlog and transcript show that President Cordano was relying on social media reaction to the use of robes and the salute—not "new information" received at a town hall with student leaders—when she called Kappa Gamma the "face of systemic racism." [*Id.*] The reference to "new information," which Plaintiffs conflate with items "shared on social media," does not, therefore, change the purely figurative nature of the statement "face of systemic racism."

Plaintiffs' reliance on *Milkovich* to claim that President Cordano based her opinion on false, incomplete, or undisclosed facts, thus misses the mark. Her language bears no resemblance to the kind of fact-based accusation at issue in

35

*Milkovich*.  "The face of systemic racism" is not "an articulation of an objectively

verifiable event."  Unlike the accusation of perjury in *Milkovich,* President

Cordano's observation is a wholly "subjective assertion," a "generic epithet."  It

contains no "provably false connotation"; it is not "susceptible of being proved

true or false"; it does not articulate any "'objectively verifiable event.'"  To the

contrary, it is exactly "the sort of loose, figurative, or hyperbolic language" that

*Milkovich* confirmed is non-actionable.  497 U.S. at 21, 22.  The phrase is simply

"too subjective, too amorphous, too susceptible of multiple interpretations" to be

provably false.  *Rosen v. Am. Israel Pub. Affs. Comm.*, 41 A.3d 1250, 1260 (D.C.

2012).

The basis of President Cordano's assertion was the controversy on social

media—itself a collection of opinions, not fact.  No set of facts—and no additional

factual disclosure—could prove or disprove that Kappa Gamma was perceived by

others as "the face of systemic racism" at Gallaudet.

President Cordano could express her impression that Kappa Gamma had

become "the face of systemic racism," without liability for defamation, regardless

of whether any set of background facts was fully disclosed, correct, or complete.

The First Amendment entitled her to so opine *regardless* of whether Kappa

Gamma members' gesture in the 1989 photo originated eighty years earlier as a

Bellamy salute; *regardless* of whether photos of Kappa Gamma in ceremonial

36

robes were new, old, or non-existent; *regardless* of what "new information" was conveyed to her at the June 5 town hall.  None of these facts could give "the face of systemic racism" a "provably false connotation."

   *Milkovich* simply does not subject indisputably figurative statements like "the face of systemic racism" to this sort of factual nitpicking. "Even if the opinion does rely on facts either supplied in the statement or implied therein, the statement is immunized if the parties cannot prove the statement is either true or false on the basis of objective evidence." *Washington v. Smith*, 893 F. Supp. 60, 62 (D.D.C. 1995), *aff'd*, 80 F.3d 555 (D.C. Cir. 1996).  "[A] statement is not actionable if it refers to a matter of public concern and it is clear that the declarant is expressing a subjective view, an interpretation, a theory, conjecture, surmise or hyperbole rather than claiming to be in possession of objectively verifiable facts."  *Id.* That is exactly the case here.

   To be sure, President Cordano narrated certain events in her addresses to the Gallaudet community—a town hall, calls for attention to Kappa Gamma, the re-emergence of the salute photo on social media.  The District Court acknowledged these facts, and found them undisputed.  [Memorandum Opinion at 13; JA14].  But these events were merely the preamble to her opinion—the backstory of why she was speaking to the community about "'a threshold moment'" in Gallaudet's history of racism "as an institution" and the suspension of

the fraternity. [JA76].  Unlike in *Milkovich,* these facts did not form the basis of

her opinion.  The same facts would allow for many different opinions, descriptions,

or perceptions—none of which would be singularly true or false.

Plaintiffs' insistence that undisclosed facts "render her entire statement one

that is capable of being proven true or false," App. Br. at 49, is nonsense. Nothing

in *Milkovich* requires that such a purely figurative or rhetorical statement be

backed by any facts at all.  Nothing in defamation law required President Cordano

to itemize the "new information" leading to demands for change by Kappa

Gamma, equate the Bellamy salute of her father's era with the salute in the 1989

photo, reiterate that *all* Greek organizations had been prohibited from publicly

wearing ceremonial robes in 2015, and so on.  No factual error, and no missing

piece of the factual puzzle, could objectively invalidate President Cordano's

opinion.

Even assuming that *Milkovich* otherwise applied to "the face of systemic

racism," finally, it would not make this statement actionable.  President Cordano

did not so much as hint that she was relying on any undisclosed facts, nor did she

hold herself out as having special knowledge of non-public facts that could make

"the face of systemic racism" verifiably true or false.

Quite the contrary, the facts preceded her.  The "photographs of the salute

and use of robes" had already been "shared on social media."  [JA76].  President

Cordano talked about the photos without identifying them precisely because they were already public; they needed no further introduction.  Kappa Gamma's president had publicly addressed the salute photo on Facebook four years earlier [JA91], acknowledging that the fraternity had "long since denounced such gestures." [*Id.*][13]  Far from being "undisclosed," photos of the fraternity dressed again in the prohibited ceremonial robes had been posted on social media [JA105], where anyone could go and confirm whether they existed.  Any reader or viewer of President Cordano's remarks was free to evaluate for himself whether Kappa Gamma had earned her epithet; no one needed to rely on "implied" or "undisclosed" facts, and she had none to offer.  *See, e.g., Pacira Biosciences, Inc. v. American Society of Anesthesiologists, Inc.,* No. 22-1411 (3rd Cir. March 24, 2023) ("[S]tatements directed at readers who are capable of performing an

---

[13] Plaintiffs argue that President Cordano's statements were "false" because she "knew" that the salute "was a Bellamy Salute, not a racist or Nazi salute." [JA 50]. But this argument falters on many levels.  President Cordano made no statement about whether the salute in the photo was or was not a Bellamy salute, and did not call it a Nazi salute. Nor is it "objectively verifiable" that the salute could only be seen as one or the other; President Cordano was addressing perceptions, and perceptions can change over time.  A reasonable viewer of the photo in 2020, nearly eighty years after the salute was last used in the Pledge of Allegiance, could easily have associated the salute with Nazis and Fascists, despite its apparently benign origins.  Kappa Gamma itself "denounced" the salute as "no longer accepted in any form." [JA91].  And Plaintiffs' claim of harm depends on the notion that viewers, such as the one who saw Costello in the photo, reasonably could interpret the gesture as "the raised hand Nazi salute."  [JA116].

independent evaluation of the facts upon which an opinion is based support the conclusion that the opinion is nonactionable.") *Id.* at 18 n.18.

### 3. Courts consistently hold accusations of racism or bigotry non-actionable in defamation.

No matter how Plaintiffs choose to interpret President Cordano's statements—as calling them racist, anti-Semitic, or supporters of Nazis, Fascists, or White supremacists [*e.g.*, AC ¶ 281; JA68]—they are inherently non-actionable opinion.

Applying this distinction between objectively verifiable fact and subjective opinion or rhetoric, courts around the country have repeatedly held that commentary on racism or bigotry does not constitute actionable defamation. *See, e.g., McCafferty v. Newsweek Media Grp., Ltd.,* 955 F.3d 352, 358 (3d Cir. 2020) ("defending raw racism and sexual abuse" is an opinion); *Cooper v. Templeton,* No. 21-CV-04692, 2022 WL 4367445 (S.D.N.Y. Sept. 21, 2022) (defamation claim by "Central Park Karen" against employer who fired her for being "racist" dismissed); *Skidmore v. Gilbert*, No. 20-cv-06415, 2022 WL 464177, at *9 (N.D. Cal. Feb. 15, 2022) ("But multiple courts (including in California) have held that a term like 'racist,' while 'exceptionally negative, insulting, and highly charged'—is not actionable under defamation-type claims because it is 'a word that lacks precise meaning' and 'can imply many different kinds of fact.'") (citing cases); *Brimelow v. N.Y. Times Co.*, No. 20 Civ. 222, 2020 WL 7405261, at *9 (S.D.N.Y.

40

Dec. 16, 2020) ("white nationalists" is "non-actionable opinion commentary");

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.,* 407 F. Supp. 3d 1258,

1276 (M.D. Ala. 2019) (assertions that plaintiff was a "hate group" not actionable);

*Squitieri v. Piedmont Airlines, Inc.,* No. 3:17CV441 (W.D.N.C. 2018)

("Statements indicating that Plaintiff is a racist are clearly expressions of opinion

that cannot be proven as verifiably true or false."); *Ratajack v. Brewster Fire*

*Dep't, Inc.*, 178 F. Supp. 3d 118, 165 (S.D.N.Y. 2016) (claims that plaintiff was a

"racist" were non-actionable opinion); *McCaskill v. Gallaudet Univ.*, 36 F. Supp.

3d 145, 159 (D.D.C. 2014) ("[T]o the Court's knowledge no decision has found

statements claiming that a person is anti-gay or homophobic to be actionable

defamation."); *Edelman v. Croonquist,* No. 09-1938, 2010 WL 1816180, at *6

(D.N.J. May 4, 2010) (characterization of in-laws as racists "a subjective assertion,

not sufficiently susceptible to being proved true or false to constitute defamation");

*Smith v. School District of Philadelphia*, 112 F. Supp. 2d 417, 420 (E.D. Pa. 2000)

("While the Court acknowledges that a statement that plaintiff is 'racist and anti-

Semitic,' if it was made, would be unflattering, annoying and embarrassing, such a

statement does not rise to the level of defamation as a matter of law because it is

merely non-fact based rhetoric.");  *Cousins v. Goodier*, 283 A.3d 1140 (Dela.

2022) (affirming dismissal of claim that lawyer was defamed by email to his firm

calling a lawsuit he filed to preserve high school's Native American mascot

41

"shockingly racist"); *Murphy v. Rosen,* No. UWY-CV-20-6056754-S, 2022 WL 1538711 (Conn. Super. Ct. May 16, 2022) ("white supremacist" is non-actionable opinion); *Williams v. Lazer,* 495 P.3d 93, 97 (Nev. 2021) (statement that real estate agent was racist, sexist, unprofessional, and unethical held non-actionable); *Reilly v. WNEP*, No. 557 MDA 2020, 2021 WL 1017154, at *7 (Pa. Super. Ct. Mar. 17, 2021) ("Even if [Defendant] referred to [Plaintiff] as a bigot, racist, and Neo-Nazi, such comments are merely his opinion under our precedents. They are legally incapable of defamatory meaning.") (citation omitted); *Garrard v. Charleston Cnty. Sch. Dist.,* 838 S.E.2d 698 (S.C. Ct. App. 2019) ("racist douchebag" cannot be interpreted as stating actual facts); *Weidlich v. Rung,* No. M2017-00045-COA-R3-CV, 2017 WL 4862068 (Tenn. App. Oct. 26, 2017) ("white supremacist" not actionable); *Overhill Farms Inc. v. Lopez,* 190 Cal. App. 4th 1248 (4th Dist. 2011) ("racist" is mere name-calling and does not contain "a provably false assertion of fact"); *Steadman v. Sinclair*, 223 A.D.2d 392, 393 (N.Y. App. Div. 1996) (letter to plaintiff's employer complaining about his racism stated non-actionable expression of opinion); *Ward v. Zelikovsky*, 643 A.2d 972, 975 (N.J. 1994) (defendant's claim that plaintiffs "hate" or "don't like" Jews is hurtful name calling but not slander); *Sall v. Barber*, 782 P.2d 1216, 1218 (Colo. App. 1989) (letter calling plaintiff a "'bigot'" who should be exiled to sagebrush country with "'skunks and coyotes'" expressed opinion); *Rybas v. Wapner*, 457 A.2d 108, 110 (Pa. Super. Ct. 1983)

(letter referring to plaintiff as "anti-Semitic" was not capable of defamatory meaning).

*Liberty Lobby, Inc. v. Dow Jones & Co., Inc.,* 838 F.2d 1287 (D.C. Cir.), *cert. denied,* 488 U.S. 825 (1988), does not, as Plaintiffs suggest, App. Br. at 47, place DC law in opposition to this long line of cases holding allegations of racism or bigotry non-actionable. This Court did not hold that any allegation of racism or anti-Semitism is necessarily one of fact rather than opinion. To the contrary, the Court agreed that "statements of opinion or belief are nonactionable as a matter of law." *Liberty Lobby*, 838 F.2d at 1293. This is both because they cannot be demonstrably false and because they are protected speech:

> The absolute protection accorded statements of opinion stems, in part, from plaintiff's burden of proving falsity, a component of which is proving that a statement is amenable to disproof. But as the language of *Gertz* suggests, the rule has independent roots in the limitations which the first amendment places on the intrusion of any branch of government, including Article III courts, into the marketplace of ideas.

*Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974)).

The Court did observe that *The Wall Street Journal's* report that Liberty Lobby had *published* the theories of an American Nazi organization—a verifiable fact, not a subjective judgment—had "sufficient defamatory content to go to a jury." *Id.* at 1294. But the Court also held that such statements were not false and therefore non-actionable. Similarly, while the Court declined to decide that the

43

term "anti-Semitic" could never be defamatory, it distinguished, by analogy, between "the use of 'fascist' as a generic epithet" and its use in a factual statement like "He was a close companion of Mussolini and a Fascist." *Id.* at 1297. It agreed with the district court that "*if* the term 'anti-Semitic' has a core, factual meaning, then the truth of the description was proved here." *Id.* (emphasis added). But the court *did not decide that issue.* Instead, it rested its decision on the lack of any evidence "tending to show the charge of anti-Semitism was made with the requisite actual malice."[14] *Id.* at 1298.

President Cordano's description of Kappa Gamma as "the face of systemic racism" falls in line with this long list of cases in jurisdictions around the country. She, like the speakers in all of these cases, was free to call out racism and bigotry where she saw it, secure in the First Amendment protection for true opinion. The District Court correctly held that '[i]f statements that someone is a racist are susceptible to multiple meanings and different interpretations such that they are non-actionable opinion, then the phrase 'the face of systemic racism,' as used by President Cordano and quoted by the Post, fits even more squarely into that category." [Memorandum Opinion at 14; JA142].

---

[14] In a decision only three months later, this Court described *Liberty Lobby* with a parenthetical stating as much: "no actual malice in Wall Street Journal charge that Liberty Lobby is anti-Semitic." *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 599 (D.C. Cir. 1988).

### C.    Even If The Challenged Statements Are Held Actionable, Plaintiffs' Claims Were Still Properly Dismissed Because President Cordano's Statement Were Substantially True.

Should this Court hold that President Cordano's statements about Kappa Gamma were "of and concerning" these Plaintiffs, and that they were statements of fact rather than opinion, it should also find that the statements were substantially true. Plaintiffs contend, in essence, that their former fraternity and its recent actions *could not* be perceived as exemplifying racism.[15] But the facts, as alleged in the Amended Complaint and as narrated by President Cordano in her two vlogs, compel the conclusion that Kappa Gamma had indeed come to be seen on social media as exemplifying racism on the Gallaudet campus.

---

[15] Citing Gallaudet's first admission of a Black student in 1950 and more recent history, Plaintiffs allege that "systemic racism had been so deeply entrenched at all levels of Gallaudet University, that there was no possibility that Kappa Gamma, its members and alumni could possibly be or have been the face of systemic racism at Gallaudet University." [AC ¶ 45-67; JA16-21]. Here, too, Plaintiffs mistreat "the face of systemic racism" as a "fact" that can only be true or false. But President Cordano never suggested that the fraternity was solely responsible for racism on campus. To the contrary, her June 9 address was entitled, "Acting on *our* history of systemic racism"; she repeatedly spoke of *systemic* racism, not racism confined to Kappa Gamma; and she called for change by "*all* parts of Gallaudet—not just our Greek organizations—because, as an institution, *we* have a history of racism and bias that must be addressed." [JA76]. Even if "the face of systemic racism" could be construed as a factual assertion, therefore, it could not, in context, reasonably be read to identify Kappa Gamma as the only offender. President Cordano later explicitly acknowledged that the fraternity "is not the sole culprit nor the face of systemic racism alone at Gallaudet…" [JA86].

45

President Cordano recited that the University "became aware of new

information that led to renewed demands for change with Kappa Gamma. . . "; that

photographs of the salute and use of robes had been shared on social media; and

that the fraternity's behavior was "unacceptable."  [JA76].  In her July 16, 2020

message to alumni, she laid out the facts in even more detail:

> In 2015, Gallaudet issued a policy that prohibited the use of
> robes in public in response to concerns about the racist impact
> of the robes brought up by SBG [Student Body Government]
> and BSU [Black Student Union].  In early June 2020, new
> evidence emerged about the Kappa Gamma student chapter's
> intention to bring back the use of robes in their meetings and
> ceremonies and this information became public, triggering
> many members of the Gallaudet community.  This prompted an
> immediate investigation that concluded the Kappa Gamma
> chapter violated the 2015 policy and resulted in the immediate
> suspension of the chapter while their case is progressing
> through the Office of Student Conduct.  They were not
> suspended because of old photos.

[AC ¶ 170; JA44-45] [*see also* JA84-87].

Plaintiffs do not, in their Amended Complaint, dispute the key factual

underpinnings of President Cordano's "face of systemic racism" statement.  They

do not contest the existence of the 2015 prohibition on the use of the robes.  They

do not deny that this prohibition followed on the heels of "concerns about the racist

impact of the robes brought up by [Student Body Government] and [Black Student

Union]"; nor that the University learned of Kappa Gamma's intention to resume

use of the banned robes; nor that this information "became public," "triggering

46

many members of the Gallaudet community." They do not dispute that Kappa Gamma was found to be in violation of a policy that originated in concerns about racism. They allege nothing to belie President Cordano's clarification that the suspension of Kappa Gamma was based only on the robes, not photos of the salute.[16] Indeed, nowhere in the Amended Complaint do Plaintiffs allege that Kappa Gamma itself denies any of the above.

The Amended Complaint agrees that President Cordano became aware at a Town Hall meeting on June 5, 2020, of "'new information resulting in renewed demands for change with Kappa Gamma.'" [AC ¶¶ 119-20; JA30-31]. The Amended Complaint also acknowledges that the Bellamy salute had "similarities in appearance" to the Italian Fascist and Nazi salutes [AC ¶ 74; JA22], and had been voluntarily discontinued by Kappa Gamma almost three decades ago. [AC ¶ 83; JA23-24]. Plaintiffs volunteer that the Dean of Student Affairs, in announcing the ban on ceremonial robes, had written: "Conduct that was tolerated decades ago, is no longer acceptable." [AC ¶ 97; JA25-26]. Finally, the Amended Complaint

---

[16] Close reading of the June 9, 2020 transcript reveals that President Cordano did not say that Kappa Gamma was suspended *because of* photographs of the salute. As well, Plaintiffs' allegation that President Cordano implied the existence of undisclosed "new" photographs when she later clarified that Kappa Gamma was not suspended because of "old" photographs, [AC ¶ 133; JA34], has no factual support in the Amended Complaint or elsewhere.

acknowledges a Facebook post by Kappa Gamma denouncing the salute as contrary to its current standards of conduct.  [AC ¶ 175; JA47-48].

A statement can be false only if it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced," and "[m]inor inaccuracies do not amount to falsity."  *Masson v. New Yorker Mag.*, 501 U.S. 496, 517 (1991) (citation omitted).  If "the face of systemic racism" is a statement of fact at all, it does not misrepresent the evidence or lead to any false impression.  Its "gist" or "sting" is no different than the sum of the facts narrated by President Cordano and those alleged in the Amended Complaint.  *White v. Fraternal Order of Police*, 909 F.2d 512, 525 (D.C. Cir. 1990). It is substantially true.  As such, it gives rise to no cause of action in defamation.

## II.    PLAINTIFFS' CLAIM FOR DEFAMATION BY IMPLICATION FAILS.

Plaintiffs offer no separate argument, on appeal, in support of their defamation by implication claim.  They merely contend, in a single sentence, that "[b]ecause plaintiffs state a claim for defamation, their defamation by implication and false light claims survive."  App. Br. at 53.  That is not necessarily so.  Plaintiffs' defamation by implication claim actually fails for *two* reasons: not only (1) because their defamation claim fails, but also (2) because there is no defamatory inference, much less any that President Cordano intended.

48

First, Plaintiffs' defamation by implication claim should fail for the same reasons as their defamation claim.  Defamation and defamation by implication share the same elements and are based on the same factual allegations.  *See Howard v. Fed. Express Corp.*, 316 F. Supp. 3d 234, 244 (D.D.C. 2018); *Smith v. Clinton*, 253 F. Supp. 3d 222, 239-42 (D.D.C. 2017).  That is, Plaintiffs' defamation by implication claim fails because President Cordano's statements are not "of and concerning" Plaintiffs and her statement that Kappa Gamma had become the "face of systemic racism" is not a verifiably false statement of fact.

Second, Plaintiffs have not alleged a plausible defamatory inference separate from President Cordano's words themselves.  "A statement may be defamatory by implication if a reasonable person could draw a defamatory inference from the statement." *Bauman*, 377 F. Supp. 3d at 15 (internal quotation marks and citation omitted).  Defamation by implication requires "an especially rigorous showing" because the publication "must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference." *Id.* at 15 (quotation marks and citation omitted).

According to the Amended Complaint, President Cordano's statements "created false and misleading implications that this Plaintiff is anti-Semitic and a supporter of Nazis, Fascists and White Supremacists and shares their beliefs."  [AC ¶¶ 281, 287, 293, 298; JA60, 69, 70].  But Plaintiffs offer no facts to suggest that

49

any such "implications" were different from, or added to, the explicit "face of systemic racism."  "A defamation by implication stems not from what is literally stated, but from what is implied."  *White v. Fraternal Order of Police,* 909 F.2d at 518.  If anything, Plaintiffs' defamation by implication claim merely specifies the *kind* of racism President Cordano believed the public perceived in Kappa Gamma.

Even if Plaintiffs had alleged a reasonable defamatory inference, moreover, they have alleged nothing to suggest that President Cordano or Gallaudet "intend[ed] or endorse[d]" any such inference.  *See, e.g., Nunes v. WP Co. LLC*, 513 F. Supp. 3d 1, 7 (D.D.C. 2020) ("And assuming [the inference] were reasonable, Plaintiff provides no warrant for the idea that 'the particular manner or language' of the Article's statements supplies 'additional, affirmative evidence suggesting that the [*Post*] intends or endorses' such an inference.") (citation omitted); *Bauman*, 377 F. Supp. 3d at 15 (facts did not allege that speaker "intended, or affirmatively endorsed" implication that plaintiff's job was, as complaint stated, to "execute the DNC's plan to cover up Seth Rich's murder").

## III.   PLAINTIFFS' CLAIM FOR FALSE LIGHT LIKEWISE FAILS.

Again, Plaintiffs put forth no independent argument for reversal on their false light cause of action.  App. Br. at 53.  This Court need only hold, therefore, that Plaintiffs' false light claim fails for the same reasons their defamation claim fails.

"An invasion of privacy-false light claim requires a showing of: (1) publicity; (2) about a false statement, representation, or imputation; (3) understood to be of and concerning the plaintiff; and (4) which places the plaintiff in a false light that would be highly offensive to a reasonable person." *Close It! Title Servs.*, 248 A.3d at 140. When the plaintiffs' defamation and false light claims are based on the same allegations, the claims will be analyzed the same way. *Id.* (affirming dismissal of defamation and false light claims); *Farah v. Esquire Mag.*, 736 F.3d 528, 540 (D.C. Cir. 2013) (affirming dismissal of false light claim); *Bauman*, 377 F. Supp. 3d at 15–16 (granting motion to dismiss defamation and false light claims); *Smith v. Clinton*, 253 F. Supp. 3d at 243 (granting defendant's motion to dismiss).

Here, Plaintiffs' false light claims are based on the same allegations as their defamation claims. [AC ¶¶ 301-305; JA71] (Florio's false light claim); [AC ¶¶ 306-310; JA72] (Costello's false light claim); [AC¶¶ 311-315; JA72-73] (Millios's false light claim); [AC ¶¶ 316-320; JA73-74] (Mallach's false light claim). They fail, therefore, on the same grounds: the statements are not "of and concerning" Plaintiffs and are non-actionable opinion. *See, e.g., Precision Contracting Sols., LP v. ANGI Homeservices, Inc.*, 415 F. Supp. 3d 113, 125 (D.D.C. 2019) (dismissing plaintiff's false light claim because removal of PCS profiles from HomeAdvisor or Angie's List did not concern plaintiff, a former customer who had

51

not yet posted a rating or review); *McCaskill*, 36 F. Supp. 3d at 158  (dismissing

defamation and false-light claims because the contested statements constituted

protected opinion rather than "demonstrably false fact").

**CONCLUSION**

For the foregoing reasons, this Court should affirm the District Court's

Order dismissing the complaint with prejudice.

Dated:  April 10, 2023

Respectfully submitted,


*/s/ Clifford J. Zatz*
Clifford J. Zatz
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004
(202) 624-2500
czatz@crowell.com

*Counsel for Defendants-Appellees*
*Gallaudet University, Board of*
*Trustees of Gallaudet University, and*
*Roberta Cordano*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,684 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

2.      This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point font.

DATED this 10th day of April, 2023.

*/s/ Clifford J. Zatz*
Clifford J. Zatz

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Clifford J. Zatz*
Clifford J. Zatz